# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2015-CA-00342-COA

**APOLINAR TERRERO RUIZ AND $56,000.00**        **APPELLANTS**
**U.S. CURRENCY**

**v.**

**STATE OF MISSISSIPPI AND HARRISON**        **APPELLEES**
**COUNTY SHERIFF'S OFFICE**

| | |
|---|---|
| DATE OF JUDGMENT: | 12/18/2014 |
| TRIAL JUDGE: | HON. LISA P. DODSON |
| COURT FROM WHICH APPEALED: | HARRISON COUNTY CIRCUIT COURT, SECOND JUDICIAL DISTRICT |
| ATTORNEYS FOR APPELLANT: | TIM C. HOLLEMAN PATRICK TAYLOR GUILD |
| ATTORNEYS FOR APPELLEE: | OFFICE OF DISTRICT ATTORNEY, SECOND CIRCUIT COURT DISTRICT BY: JOEL SMITH ALISON B. BAKER JASON M. JOSEF |
| NATURE OF THE CASE: | CIVIL - OTHER |
| TRIAL COURT DISPOSITION: | ORDERED SEIZED MONEY FORFEITED AND AWARDED MONEY TO HARRISON COUNTY SHERIFF'S OFFICE |
| DISPOSITION: | REVERSED AND RENDERED - 09/27/2016 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**EN BANC.**

**ISHEE, J., FOR THE COURT:**

¶1. After being pulled over for a traffic stop by officers with the Harrison County Sheriff's Department in 2012, Apolinar Terrero Ruiz was found to have had $56,000 in cash hidden in a secret compartment in his vehicle. The money was seized, and a trial took place in the Harrison County Circuit Court regarding whether the money should be forfeited. At

the conclusion of the trial, the circuit court determined that the money was substantially connected to illegal drug trafficking. Accordingly, the money was forfeited to the sheriff's department. Aggrieved, Ruiz appeals. Finding error, we reverse and render the circuit court's judgment.

## STATEMENT OF FACTS

¶2. On November 8, 2012, Sergeant Bruce Carver, an officer with the sheriff's department, became aware of a 2008 Mazda sedan following too closely behind a tanker truck carrying explosive liquids in Biloxi, Mississippi. Accordingly, Sergeant Carver made a traffic stop of the vehicle. Deputy Brandon Hendry assisted in the stop. Ruiz, a legal United States citizen originally from the Dominican Republic, was the driver of the vehicle detained. Sergeant Carver testified that upon approaching the vehicle, he noticed a strong scent, and saw two new air fresheners hanging from the rearview mirror. Sergeant Carver also observed two cell phones lying on the passenger's seat along with a map. He further observed that the ignition of the vehicle housed only a single key – not a set of keys. When asked about Ruiz's destination, Ruiz, who admittedly does not speak fluent English, stated that he was headed to Houston, Texas, to see his pregnant daughter. Sergeant Carver stated that these factors led him to believe that Ruiz may be involved in drug trafficking.

¶3. Sergeant Carver returned to his vehicle and contacted the El Paso Intelligence Center (EPIC) to request information on Ruiz. Ruiz was not listed in EPIC's database, nor does Ruiz have any prior legal association with any drug activity. Nonetheless, Sergeant Carver

2

asked Ruiz for permission to search his vehicle.

¶4.     Ruiz was presented with a document requesting his consent to search the vehicle. The document was written in Spanish, Ruiz's native language. Ruiz signed the consent form, and was asked, in English, if there were any weapons, illegal objects, or large sums of money in the vehicle. Ruiz responded that there were not. Ruiz was then escorted to Sergeant Carver's vehicle while the officers searched the vehicle.

¶5.     The officers soon discovered what they termed a "hidden compartment" between the trunk and the backseats. Although the officers were unable to completely open the compartment at that time, they were able to pry it open widely enough to reach inside. The officers could feel stacks of money banded together with rubber bands and wrapped in a towel. While the officers were searching the vehicle, Ruiz was recorded in the patrol vehicle saying in Spanish, "My God, I got myself into one," and later, "My God, my God."

¶6.     The search of the vehicle was relocated to a nearby work center used by the sheriff's department. Ruiz opened the compartment for the officers. Discovered in a black bag was $56,000 in cash, along with a vacuum-sealer machine, vacuum-seal bags, and Saran Wrap, all wrapped in a towel. The officers at the work center also discovered residue in the compartment that they testified "appeared to be marijuana" debris. However, this material was not preserved, collected, or tested. Likewise, Ruiz was not questioned about or shown the residue.

¶7.     Sergeant Carver asked Ruiz about the money and the vacuum-seal items. Ruiz stated

3

that the money was his. He said he had been saving the money for quite some time and had plans to open a grocery store in Houston with his daughter. Ruiz said the reason for his trip from Pennsylvania to Texas was to see his daughter and discuss opening the grocery store. Sergeant Carver asked how much Ruiz had stored in the vehicle, to which he responded "fifty-six."

¶8. With respect to the vacuum-seal machine and bags, Ruiz stated that he was a diabetic and had planned to use the machine to seal and save diabetic-friendly food to eat during his trip. Ruiz testified that he had medication for his diabetes in his suitcase in the trunk of his vehicle at the time of the incident, but that he was not questioned about the vacuum-seal items or given an opportunity to explain their presence before the money was taken and he was released.

¶9. After the authorities finished questioning Ruiz and searching the vehicle, the vehicle was returned to Ruiz and he was released without being charged with any crimes. However, the money was confiscated for further analysis. A trial ensued in the circuit court to determine whether or not the money was substantially connected to drug trafficking and should be forfeited.

¶10. At trial, Ruiz was asked how he saved up such a large sum of money in cash. He testified that most of the money consisted of twenty-six years of savings from working in construction and carpentry. He also stated that after refinancing a home he owned in Massachusetts, he received $20,000 in cash from equity, which he used, in addition to $7,000

his daughter had given him to invest, to begin making private loans and receive interest on the loans – transactions all completed in cash. He was unable to produce the names, addresses, or telephone numbers of people to whom he loaned money, and confessed that he did not have any records of the alleged transactions. Likewise, there was no tax documentation regarding the money.

¶11. Ruiz was also questioned about the alleged grocery-store business plan. He admitted that he had never worked in a restaurant or grocery store. He also did not have any potential locations in mind for the business, nor had he done any research on available commercial real estate prior to departing for his trip to Texas.

¶12. With regard to the hidden compartment, Ruiz stated that he had just purchased the used vehicle in question four months prior to the stop. Ruiz said that he was unaware of the supposed hidden compartment when he purchased the vehicle, but discovered it while cleaning the vehicle later on. He denied having modified the vehicle in any way and stated that the compartment was easily opened by folding down the backseats. The record indicates, in fact, that Ruiz voluntarily opened the compartment for the officers at the work center.

¶13. For purposes of the trial, the money found in Ruiz's vehicle was counted and listed by denomination as follows: (1) $350 in $10 bills; (2) $23,700 in $20 bills; (3) $5,750 in $50 bills; and (4) $26,200 in $100 bills. At trial, Sergeant Carver and Deputy Hendry testified that, in their professional experience with illegal-narcotics activities, large amounts of drug-

related money most commonly consisted of $20 and $100 bills since those are the most frequently used dollar bills in drug transactions. They also testified that it was routine to discover large amounts of drug-related money outside the presence of drugs. They testified that this occurred because drug suppliers wanted payment before releasing the drugs to the traffickers.

¶14. At the close of the trial, the circuit court ruled from the bench, and ordered the funds forfeited to the sheriff's department. The circuit judge determined that the sheriff's department had met its burden of showing that the money seized was intended to be used or had been used in connection with illegal drug sales or distribution. Ruiz now appeals the circuit court's judgment.

## DISCUSSION

¶15. "The appropriate standard of review in forfeiture cases is the familiar substantial evidence/clearly erroneous test." *Four Thousand Eight Hundred One Dollars v. Lafayette Cty. Metro Narcotics Unit*, 22 So. 3d 394, 396 (¶6) (Miss. Ct. App. 2009) (citing *Galloway v. City of New Albany*, 735 So. 2d 407, 410 (¶15) (Miss. 1999)). The Mississippi Supreme Court "has held that in determining whether forfeiture is appropriate, the question becomes whether[,] given all of the evidence considered together, a rational trier of fact may have found by a preponderance of the evidence that the funds were the product of or instrumentalities of this state's controlled substances act." *Evans v. City of Aberdeen*, 926 So. 2d 181, 187 (¶19) (Miss. 2006) (quoting *Hickman v. State*, 592 So. 2d 44, 48 (Miss.

6

1991)).

¶16.    In *Evans*, authorities with the Aberdeen Police Department in Aberdeen, Mississippi, received a tip from a confidential informant, who stated that illegal drug transactions were taking place in the home of James Evans. *Evans v. City of Aberdeen*, 925 So. 2d 850, 851 (¶1) (Miss. Ct. App. 2005). Subsequently, a search warrant was issued and executed on Evans's home. *Id*. During the search, officers discovered a brass container attached to a scrubbing pad, a piece of aluminum foil with holes in it, several plastic bags, and a pack of cigarettes with residue in the bottom. *Id*. Discovered nearby, hidden in a piece of furniture, was $7,600 in cash. *Id*. The officers placed the cash in a brown paper bag that they had retrieved from the home's basement. *Id.* Later, a drug dog alerted the officers to the presence of drugs on or in the brown paper bag. *Id*. The money was subsequently seized and forfeited. *Id*. at (¶2).

¶17.    On appeal, this Court found that the circuit court erred in determining that the City of Aberdeen had met its burden of proof that the money was subject to forfeiture. *Id*. at 855 (¶23). The supreme court granted certiorari and, while agreeing with our ultimate holding, distinguished its ruling from that of this Court in several areas of analysis. *Evans*, 926 So. 2d at 183 (¶3). Specifically, the supreme court recognized that an analysis of whether money is subject to forfeiture is grounded in a "totality of the circumstances" point of view, as seen in *United States v. Funds in the Amount of $30,670*, 403 F.3d 448 (7th Cir. 2005). *Evans*, 926 So. 2d at 183 (¶ 3). Nonetheless, the supreme court went on to emphasize our adoption

7

of the ruling of the Fifth Circuit Court of Appeals in the factually similar case of *United States v. $38,600.00 in United States Currency*, 784 F.2d 694 (5th Cir. 1986),[1] where the Fifth Circuit stated:

> There seems little question that this evidence, when considered collectively, gives rise to a strong suspicion, perhaps even probable cause of *some* illegal activity. It is not quite so apparent, however, that these facts give rise to a reasonable belief, supported by more than mere suspicion, that [the defendant] furnished, intended to furnish, or had received the money [in question] *in exchange for drugs*.

*Evans*, 926 So. 2d at 187 (¶ 18) (emphasis in original) (quoting *United States v. $38,600 in United States Currency*, 784 F.2d at 698). Such is the question here – whether or not the facts, when taken as a whole, show by more than just suspicion that the money discovered in Ruiz's vehicle was garnered or provided to be used in exchange for drugs. We find that the answer is no.

¶18. While the facts may garner suspicion that the money could have been drug related, there is no actual tie between the money and illegal drug trafficking, even when taking the facts as a whole. Most notably, the residue that the officers alleged appeared to be marijuana was never collected, preserved, or tested. Ruiz was never charged with any crime relating to possession of illegal narcotics stemming from the traffic stop, and he had no prior criminal record or known illegal-narcotic involvement at the time of the incident. Additionally, while the existence of a hidden compartment in a vehicle may raise suspicion, Ruiz had very

---

[1] *United States v. $38,600 in United States Currency* was superceded in part by a federal statue as to the government's burden of proof in civil-forfeiture cases.

recently purchased the vehicle second-hand, and claimed to have had no knowledge of the compartment until weeks before his trip to Texas. Likewise, Ruiz had a plausible explanation for every other question asked of him by the sheriff's department, including issues surrounding the maps and directional information found in the passenger's seat, the reason for Ruiz's trip to Texas, the existence of the vacuum-seal items, and the source and purpose of the cash.

¶19. The State points out two notable factors that it claims cast doubt on Ruiz's credibility. The first is Ruiz's false response to Sergeant Carver's question to Ruiz prior to the search of Ruiz's vehicle regarding whether there were large amounts of money located in the vehicle. Specifically, the question was asked to Ruiz in English as to whether there were any weapons, narcotics, or large sums of money in the vehicle. Ruiz responded that there were not. However, Ruiz testified that he does not speak fluent English and did not fully understand the question he was being asked. The question was, in fact, a compound question, and Ruiz stated that he simply did not understand each element of the question at the time it was asked. Indeed, Ruiz made mention of the money in the vehicle upon being questioned about the hidden compartment. He responded in Spanish that there was money inside.

¶20. The State's second notation regards the discrepancy between the destination address found in Ruiz's vehicle and his daughter's actual address. At trial, Ruiz noted that his daughter essentially lived in an area that was complicated to reach, and that he was meeting

9

her at an easily discoverable location for her to then lead him to her house. Ruiz stated that he had not been to his daughter's residence before and that she did not want him to get lost.

¶21. The State also points to the experience of the officers conducting the search of the vehicle in order to garner strength for the officers' proposition that the residue discovered in the compartment constituted marijuana. With respect to the officers' years of experience, the fact that the residue was not collected and scientifically tested and proven to be marijuana leaves a vast amount of speculation as to the true nature of the residue. Ruiz cites to *Waltman v. Payne*, 535 F.3d 342 (5th Cir. 2008), to support his theory that the sheriff's department officers could have easily been incorrect in their assertions that the residue was marijuana given that same sheriff's department's prior mistakes in the identification of marijuana. In *Waltman*, the Harrison County Sheriff's Department cut down and removed approximately 500 plants from Marion Waltman's property, without contacting Waltman or testing the plants first, on the premise that the sheriff's department's officers, along with other authorities, believed the plants to be marijuana plants. *Id*. at 346. Upon learning of the plants' removal on the evening news, Waltman contacted the sheriff's department and informed them that the plants were actually kenaf plants – a plant favored by deer and other wildlife and used by Waltman in deer-hunting activities. *Id*.

¶22. Prior mistakes notwithstanding, the residue itself is the only alleged element that directly indicates illegal narcotics were involved in any way. Failure to collect, test, and preserve the residue for trial rendered it a rather unpersuasive piece of evidence in

determining whether the money discovered near the residue was substantially connected to illegal drug trafficking.

¶23. While we recognize that many factors in Ruiz's situation give rise to an element of suspicion, we fail to see how the factors in play support a reasonable belief that the totality of the circumstances shows, by a preponderance of the evidence, that the money in question was used in exchange for drugs. The State simply did not meet its burden of proof, and the circuit court erred in forfeiting the funds. As such, we reverse and render the circuit court's judgment and order the funds returned to Ruiz.

¶24. **THE JUDGMENT OF THE HARRISON COUNTY CIRCUIT COURT, SECOND JUDICIAL DISTRICT, IS REVERSED AND RENDERED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO HARRISON COUNTY.**

**LEE, C.J., IRVING, P.J., BARNES, FAIR, JAMES, WILSON AND GREENLEE, JJ., CONCUR. CARLTON, J., DISSENTS WITH SEPARATE WRITTEN OPINION, JOINED BY GRIFFIS, P.J.**

**CARLTON, J., DISSENTING:**

¶25. In applying the controlling standard of review to this case involving an action in rem, I submit that we should affirm the circuit court's judgment.[2] *See Six Thousand Dollars v. State ex rel. Miss. Bureau of Narcotics*, 179 So. 3d 7, 14 (¶19) (Miss. Ct. App. 2014) (discussing the appropriate standard of review to apply in forfeiture cases). I therefore dissent from the majority's opinion.

---

[2] *See Jefferson v. City of Kosciusko*, 111 So. 3d 1253, 1257 (¶21) (Miss. Ct. App. 2013) ("A civil forfeiture constitutes an in rem proceeding, and the action proceeds upon a legal fiction that the property itself is guilty of wrongdoing.").

¶26.    As stated in *Hickman v. State ex rel. Mississippi Department of Public Safety*, 592 So.

2d 44, 45-46 (Miss. 1991), a civil forfeiture proceeding is not a criminal prosecution, and

Mississippi law requires the State to prove all facts requisite to the forfeiture by a

preponderance of the evidence.  *See also One Hundred Seven Thousand Dollars U.S.*

*Currency v. State ex rel. Harrison Cty. Sheriff's Dep't*, 643 So. 2d 917, 922 (Miss. 1994)

("[T]he State must prove that it is more likely than not that the currency was possessed by

the claimant with the intent to be used in connection with an illegal narcotics trafficking

scheme." (citation omitted)); *Saik v. State ex rel. Miss. Bureau of Narcotics*, 473 So. 2d 188,

191 (Miss. 1985) (discussing that the burden is on the State to prove forfeiture by a

preponderance of the evidence); Miss. Code Ann. § 41-29-179(2) (Rev. 2013) (discussing

the burden of proof required to show that property is subject to forfeiture).

¶27.    "As in any civil action, the trier of facts may act on circumstantial as well as direct

evidence . . . ."  *Hickman*, 592 So. 2d at 46 (quoting *Reed v. State ex rel. Miss. Bureau of*

*Narcotics*, 460 So. 2d 115, 118 (Miss. 1984)).  As the supreme court stated in *Hickman*:

> The question is not how we would have resolved the evidentiary and ultimate
> fact disputes had we been the triers of fact, but whether, given the record, a
> reasonable factfinder may have done as was done.  This standard substantially
> limits appellate review of the facts, save only where the circuit court has
> applied an erroneous legal standard to decide the question of fact.

*Id.* (citing *McClendon v. State*, 539 So. 2d 1375, 1377 (Miss. 1989)).  *Compare Tran v. State*,

962 So. 2d 1237, 1244-47 (¶¶26, 39) (Miss. 2007) (discussing the State's seizure of money

pursuant to a civil forfeiture action and the various unlawful activities that could result in

12

money laundering and a violation of the Mississippi Uniform Controlled Substances Law).[3]

¶28. Based upon a review of the record and relevant caselaw, I would affirm the circuit court's judgment. The record reflects sufficient evidence for a reasonable factfinder to conclude that Ruiz and the $56,000 in United States currency violated the Mississippi Uniform Controlled Substances Law. *See* Miss. Code Ann. § 41-29-101 to -191 (Rev. 2013). As a result, I dissent from the majority's opinion.

**GRIFFIS, P.J., JOINS THIS OPINION.**

---

[3] *See also Six Thousand Dollars v. State ex rel. Miss. Bureau of Narcotics*, 179 So. 3d 1, 4-6 (¶¶5-8) (Miss. 2015) (discussing the legal standard applicable to the innocent-owner exception and finding that the defendant's uncorroborated testimony that he owned money seized by law enforcement was insufficient to establish the innocent-owner exception).