# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2023-CA-00362-COA

**RAE YOUNG CHUNG**                                                          **APPELLANT**

**v.**

**STATE OF MISSISSIPPI, EX REL. BRANDON**                     **APPELLEE**
**POLICE DEPARTMENT**

DATE OF JUDGMENT:                 02/23/2023
TRIAL JUDGE:                              HON. DEWEY KEY ARTHUR
COURT FROM WHICH APPEALED:   RANKIN COUNTY CIRCUIT COURT
ATTORNEY FOR APPELLANT:         STEVEN CRAIG PANTER
ATTORNEYS FOR APPELLEE:          CHRISTOPHER TODD McALPINE
                                                  MICHAEL SHELTON SMITH II
NATURE OF THE CASE:                CIVIL - OTHER
DISPOSITION:                            REVERSED AND RENDERED - 10/08/2024
MOTION FOR REHEARING FILED:

**BEFORE WESTBROOKS, P.J., McDONALD AND McCARTY, JJ.**

**WESTBROOKS, P.J., FOR THE COURT:**

¶1.     Rae Young Chung was driving his commercial tractor and trailer on Interstate 20 when he was pulled over by an officer with the Brandon Police Department. During the stop, the officer found no drugs (or vestiges of drugs), but he found $225,000 in a bag in his truck. The money was seized, and the State initiated a forfeiture action in the Rankin County Circuit Court. After a bench trial, the circuit court determined that the money was forfeitable pursuant to Mississippi Code Annotated section 41-29-153 (Supp. 2017). Aggrieved, Chung appeals, arguing that the State did not sufficiently prove that the money seized from him was subject to forfeiture under the applicable statutes. Finding error, we reverse and render the circuit court's judgment.

**FACTS AND PROCEDURAL HISTORY**

¶2.     On September 23, 2020, Rae Young Chung was traveling westbound on Interstate 20 in his commercial truck and trailer. He was pulled over by Officer Joseph French,[1] a narcotics officer with the Brandon Police Department, for following other vehicles too closely and for traveling 74 miles per hour (mph) in a 70 mph zone.

¶3.     Chung was seventy years old at the time of the stop. He is a native of South Korea, has an elementary school education, and can speak only limited English. A review of the dash-camera video of the stop reveals that Chung's English was underdeveloped, and there was a clear language barrier between Officer French and Chung. Nevertheless, Officer French did not contact an interpreter or use a translation device. He first informed Chung of the reason for the stop. He inquired about the reason for his travels, ownership of the truck, and his criminal and driving history. Officer French also requested to see Chung's driver's license, bills of lading, and logbooks. Before heading back to his patrol vehicle, Officer French assured Chung that he would only be receiving a warning citation. He testified that during this time, he ran Chung's information through the National Crime Information Center (NCIC) and the El Paso Intelligence Center (EPIC) databases.[2] The results from both databases came back clear.

---

[1] Officer French is now a Lieutenant; however, we will refer to him as Officer French throughout the opinion since that was his title and rank at the time of the incident.

[2] According to testimony, the NCIC database is used to "verify that they're not wanted, that their license is valid, [and] not suspended." The EPIC database will reveal "if there's any intelligence out there as far as drug trafficking."

¶4.    Officer French saw on Chung's bills of lading that he was hauling car parts. When he ran Chung's driver's license, he saw that he had previously stopped Chung on September 16, 2019. At that time, Chung was using an Electronic Logging Device (ELD), but the GPS feature was not working. However, during the stop in question, Chung was using paper logs. When asked why he was operating with paper logs, Chung informed Officer French that his ELD had stopped working. While looking through Chung's paper logs, Officer French claimed there was a discrepancy concerning travel time.[3] The purported discrepancy was that Chung logged a trip from Meridian, Mississippi, to Demopolis, Alabama, as a thirty-minute trip. According to Officer French, it normally takes forty-five minutes to make that trip. Officer French later testified that the paper logs and the relatively minor discrepancy were not unusual and "not anything criminal." He explained that "in the commercial motor vehicle world, you see a lot of drivers hiding time because they have a time line; they can only drive 11 hours a day."

¶5.    Officer French also saw that Chung took a three-day break in California. Officer French found that unusual because the main objective for owner-operators is "[t]o make as much money as they possibly can, because everything inside the commercial motor vehicle world is against the driver: repairs, fuel, broker fees, insurance. . . . [T]hey want to be on the road as much as they can." However, Chung later testified that the law requires that "if he spends 70 hours on the road, he has to . . . be off 30 hours," and Chung said he typically

---

[3] The paper logs were never entered into evidence.

3

chooses to spend those hours in California, where he resides.

¶6. Officer French asked Chung if he was hauling anything illegal such as weapons, drugs, or money. Chung replied no. Officer French eventually moved Chung to the back of his patrol car to get him out of the rain. Officer French began using the Google Translate app to communicate with Chung. Using the app, Officer French asked Chung again if he was in possession of any weapons, drugs, or large amounts of money. Chung indicated that he did have money in the truck. Officer French asked if it was over $100,000, and Chung responded yes. When asked why he was carrying such a large amount of money, Chung informed him that he needed money for repairs to his truck. Officer French later testified that "based off all the other factors with the logbooks, the inconsistencies in it, him admitting that he had money inside of the vehicle, now everything started looking more like he was a drug money courier at that point in time."

¶7. Officer French asked if he could search the truck, and Chung consented. Chung retrieved a bag containing the money, and he handed it over to Officer French. The bag contained forty-five envelopes with five thousand dollars in each envelope, totaling $225,000. Chung testified that each time he saved five thousand dollars, he would put it in an envelope and store it in the bag. This method allowed him to store the money more easily in the bag, which was relatively small. Nineteen envelopes contained the BBCN Bank logo.[4]

---

[4] BBCN Bank was Chung's bank located in Koreatown, Los Angeles, California. After a merger in 2016, BBCN Bank is now known as Bank of Hope.

Also, some of the envelopes looked older and more tattered and discolored compared to others. After examining the envelopes, Officer French decided to contact more law enforcement and move the traffic stop to the Brandon Amphitheater. While there, Chung revealed to a Homeland Security Investigations (HSI) agent that the money was his life savings that he had accumulated from 2010 to the present. He kept the money in his truck because he lived in his truck, and he did not have a home where he could store the money.

¶8. While at the amphitheater, Officer French searched Chung's truck again. No drugs, drug paraphernalia, or weapons were found in the truck, so the officers decided to conduct a drug detection test on the money. Officer French contacted Deputy Picou[5] and requested the assistance of a narcotics detection canine. Deputy Tony Shack with the Rankin County Sheriff's Department and Voodoo, a trained narcotics canine, arrived at the scene. The officers placed three empty boxes out for Voodoo to sniff in order to "proof" the boxes, i.e. confirm they were empty. Deputy Shack claimed that Voodoo showed no interest in any of the empty boxes. Officer French then claimed that he placed Chung's money into one of the boxes, put lids on all three boxes, and placed them out again for Voodoo to sniff. Officer French filmed Voodoo sniffing the three boxes, but there is no footage of the money actually being placed into one of the boxes. Deputy Shack claimed that Voodoo reacted to the box with the money and displayed "Just Noticeable Difference" (JND).[6] Deputy Shack testified

---

[5] Deputy Picou's name is incorrectly spelled "Pikku" in the record.

[6] Deputy Shack testified that a JND "could be a slight odor or anything like that that changes the dog's behavior . . . to a controlled substance."

5

that when canines are alerted to drugs, they will "sit, or they can stand there and stare at it or . . . they used to be able to scratch." At trial, Deputy Shack acknowledged that Voodoo did not do any of these actions.

¶9.     Officer French also asked Chung if he could conduct a forensic examination on his phone using Cellebrite, and Chung consented. While conducting the forensic examination, Officer French noticed that there were only calls and messages from that day. He suspected that Chung had deleted calls and messages. Officer French also said that he observed Chung making a phone call in his truck prior to the forensic examination, but he claimed he could not find that call during the examination.

¶10.    While Officer French continued to investigate the matter, Chief William Thompson took the money to the bank to have it counted. Officer French gave Chung a receipt and case number and asked him for good contact information. Chung provided him with two phone numbers: the first phone number belonged to him, and the second phone number belonged to another individual. When Officer French ran the phone numbers, he found that the second number was deconflicted[7] with a DEA case out of New York. He also noticed that there was a New York highway use tax (HUT) decal on the front bumper of Chung's truck.

¶11.    Officer French contacted Agent Aria Vennin, a DEA special agent in New York. She informed him that the second number that Chung provided had been in contact with one of

---

[7] Officer French testified, "To deconflict something is to basically go in there and check in a database to see if somebody else is investigating the same person. . . . It's basically to keep any investigations from conflicting with each other."

6

her targets that she was investigating at that time. Her target was a commercial motor vehicle driver she suspected was transporting large amounts of narcotics into New York. Agent Vennin later provided Officer French with "phone tolls" (logs) from her investigation. The phone tolls showed that between May 5 and May 21, 2020, her target's phone number and the second phone number that Chung provided had contacted each other fifty-two times. Seventy-five percent of the calls were one minute in length, and all the calls were made outside of normal business hours. However, there were no calls from Chung's personal phone number to the target's phone number.

¶12. On October 7, 2020, Officer French received a deconfliction notice from HSI Agent Mason Wilke. Agent Wilke ran Chung's DOT on SAFER[8] and saw that the address and phone number listed for Chung's trucking company was the same address and number listed for another trucking company owned by a driver he was investigating. Officer French testified:

> Agent Wilke was conducting an investigation up in New York and ran a DOT number and it came back to the same address and the same telephone number which Mr. Chung's . . . company came back to. On October 14th, Agent Wilke called me and told me that the day before he went back to the same motel where he saw that truck that he was interested in and noticed that behind the CMV [(Commercial Motor Vehicle)] was a U-Haul truck and there was people outside the truck at a hotel moving boxes from the CMV into the U-Haul truck. So him and his team walked up and asked what they were doing and eventually ended up seizing 1,200 pounds of marijuana and at the time I was told close

---

[8] The Federal Motor Carrier Safety Administration facilitates a database called Safety and Fitness Electronic Records (SAFER). It is open to the public and provides information about trucking companies.

7

to a half million dollars. I was later sent a report saying that the money was actually $486,210 in bulk currency that they seized.

However, Officer French admitted that the address and number that allegedly linked Chung to this suspect was associated with an insurance agent who works with several trucking companies in California. He testified, "[I]f you run that number, it comes back to – I can't remember how many trucking companies, but it was a large number. It was probably around 30 or so."

¶13. The State submitted a petition for forfeiture on September 28, 2020. The court held a bench trial on November 29, 2022. The State called Officer French and Deputy Shack during its case-in-chief. The State also called Chief Nick McLendon with the Richland Police Department to testify as an expert in criminal interdiction and drug trafficking. Chief McLendon testified that in his opinion, Chung fit the profile of a drug courier. Chief McLendon testified that some of the "cues" that he typically looks out for are "paper log[s], excessive downtime at source areas, excessive downtime in known destination areas, owner-operator[s], high DOT number[s], multiple cell phones[,] . . . cell phone numbers which deconflict with active federal investigations, [and] specific tools laying out."

¶14. Chung moved for a directed verdict after the State rested. The court denied the motion. With the help of a Korean interpreter, Chung testified on his own behalf. He maintained that the money that was seized from him that day was money that he had been saving since 2010.

¶15. At the conclusion of trial, the court requested that both parties submit proposed

8

findings of fact and conclusions of law by January 6, 2022. The court adopted the State's findings of fact and conclusions of law nearly verbatim on February 9, 2023, holding that the seized money was forfeitable. The court entered its order of forfeiture on February 23, 2023. Chung subsequently filed his notice of appeal on March 24, 2023.

## STANDARD OF REVIEW

¶16. "When reviewing the factual findings of the circuit court sitting as the sole trier of fact in a bench trial, we apply the substantial-evidence standard of review." *Delta Reg'l Med. Ctr. v. Taylor*, 112 So. 3d 11, 23 (¶35) (Miss. Ct. App. 2012) (citing *Covington County v. G.W.*, 767 So. 2d 187, 189 (¶4) (Miss. 2000)). "The findings of the trial judge will not be disturbed unless the judge abused his discretion, was manifestly wrong or clearly erroneous or applied an erroneous legal standard." *Id*. at 19 (¶21). "A finding is 'clearly erroneous' when, although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been made." *Phillips v. City of Oxford*, 368 So. 3d 317, 323 (¶20) (Miss. 2023) (quoting *UHS-Qualicare Inc. v. Gulf Coast Cmty. Hosp. Inc.*, 525 So. 2d 746, 754 (Miss. 1987)).

## DISCUSSION

¶17. Chung asserts several arguments on appeal, but the dispositive issue is whether the State failed to prove that the $225,000 seized from Chung was subject to forfeiture. Mississippi Code Annotated section 41-29-153(a)(5) provides that "all money . . . which [is] used, or intended for use, in violation of this article or in violation of Article 5 of this

chapter" is subject to forfeiture.

> Forfeiture statutes are penal in nature and must be strictly construed. In a civil forfeiture case, the question is whether, given all of the evidence taken together, a rational trier of fact could have found that the funds were the product of or the instrumentalities of violations of the State's Uniform Controlled Substances Laws.

*In re One Hundred Thirty-Seven Thousand Three Hundred Twenty-Five Dollars ($137,325.00) in U.S. Currency v. State ex rel. Pelahatchie Police Dep't*, 204 So. 3d 317, 323 (¶22) (Miss. Ct. App. 2016) (quoting *Evans v. City of Aberdeen*, 925 So. 2d 850, 853 (¶11) (Miss. Ct. App. 2005)). Forfeiture "is a tool of public protection, a tool of law enforcement . . . precisely mandated by statute[,] and when the statute is carefully and correctly followed[,] we will favor such forfeiture[;] when the statute is not followed or supported by necessary evidence we will disfavor such forfeiture." *One Hundred Seven Thousand Dollars ($107,000.00) U.S. Currency (Tagle) v. State ex rel. Harrison Cnty. Sheriff's Dep't*, 643 So. 2d 917, 920 (Miss. 1994). "The burden is on the State to prove forfeiture by a preponderance of the evidence." *Forty-One Thousand Eighty Dollars ($41,080.00) in U.S. Currency v. State ex rel. Brandon Police Dep't*, 366 So. 3d 876, 883 (¶21) (Miss. Ct. App. 2022) (citing *Neely v. State*, 628 So. 2d 1376, 1381 (Miss. 1993)). Accordingly, "'[t]he State must prove that it is more likely than not that the currency was possessed by the claimant with the intent to be used in connection with an illegal narcotics trafficking scheme.'" *Id*. at (¶26) (quoting *Jones v. State*, 607 So. 2d 23, 29 (Miss. 1991)).

¶18. The court based its forfeiture determination on three main factors: (1) Chief

McClendon's testimony about Chung fitting the drug courier profile, (2) the financial information submitted by Chung, and (3) the DEA investigations.

### 1. Drug Courier Profile Testimony

¶19. The State called Chief McClendon to testify as an expert in the field of criminal interdiction and drug courier profile. Chief McClendon testified that there were several factors that led him to believe that Chung fit the drug courier profile. The court summarized these factors in its findings of fact and conclusions of law:

> a. The westbound direction of travel on Interstate 20 from Georgia to California, both known as hubs for drug distribution and trafficking, with a turnaround in the Atlanta area;
>
> b. The paper logbooks, which are easily manipulated and gave Sgt. French suspicion of criminal activity;
>
> c. The fact that on a previous occasion, Sgt. French stopped Chung, who was found to be using electronic logs with the GPS feature turned off, which also gave Sgt. French suspicion of criminal activity;
>
> d. The packaging of the currency in 45 separate $5,000.00 envelopes, which make it easy to count for quick exchanges;
>
> e. The fact that Chung claimed the money was for truck repairs when he had more than enough to purchase two CMVs;
>
> f. The deleted calls on the cell phone;
>
> g. The fact that the number Chung provided was in contact multiple times with a known drug trafficker and target of a DEA investigation;
>
> h. The fact that the canine showed JND to the currency;
>
> i. The fact that the DEA/HSI recently busted the same organization in New Jersey for moving large amounts of marijuana and currency; and

11

j. The fact that the truck had the New York state tax stickers on the front bumper.

Chung was able to provide the court with plausible explanations to rebut each of these factors. In our analysis, *Ruiz v. State*, 227 So. 3d 1132 (Miss. Ct. App. 2016), is most helpful. In *Ruiz*, this Court reversed a forfeiture award after finding that the facts, taken as a whole, failed to establish an actual link between the money seized and drug trafficking. *Id*. at 1136 (¶18). The Court found that although many of the facts garnered suspicion of drug activity, none of the evidence presented actually demonstrated that Ruiz was involved in any drug activity. *Id*. Furthermore, the Court gave much weight to the fact that Ruiz provided plausible explanations to dispel the suspicions raised against him. *Id*. The same is true here.

¶20. Regarding his travel from Georgia to California, Chung testified that he was delivering parts to Kia in West Point, Georgia.[9] Officer McLendon represented that Chung was in the "Atlanta area," which he characterized as " a major narcotics distribution hub[.]" However, Chung was actually quite a distance from Atlanta. As the dissent points out, West Point, Georgia, is eighty miles from Atlanta, Georgia. This comparison would be the equivalent of saying McComb, Mississippi, is in the Jackson area. The dissent insinuates it is possible Chung could have been in the Atlanta area because he "used only a paper logbook, [and] we do not know his precise movements." *Post* at note 12. However, there

---

[9] Officer McClendon characterized Georgia and California as "hubs for drug distribution"; however, he failed to cite specific cities or areas that are known for drug distribution. Simply characterizing the entire state as a hub is overly broad.

was no evidence presented to establish that Chung misrepresented his whereabouts, and we decline to make any speculations. Chung's interpreter testified that "from California he went to West Point, then went to Montgomery and picked up another load of parts going back to the distribution warehouse in California[.]" Chung's bills of lading, which were examined by Officer French, confirmed that Chung was hauling car parts. He further explained, "I checked what was inside the trailer. We popped the seal, checked just to verify there was nothing back there that wasn't supposed to be back there. [I] [s]aw what was supposed to be on the bills of lading[.]" After completing both deliveries, Chung headed back west to California. California is the state where Chung resides and where his son lives. Officer French testified that he found it suspicious that Chung spent three days of downtime in California; however, Chung explained that the law only allows him to spend seventy hours on the road in a week, and he prefers to spend his downtime in California.

¶21. Turning to the logbook, Chung was previously stopped by Officer French in 2019. During that stop, Chung was using an ELD. Officer French testified several times that the GPS feature on the ELD was "not working" and that he made a note of this during the previous stop. Officer French then later testified that the GPS feature was disabled. It is unclear if the GPS was simply not working or turned off, and the State never specifically asked Chung why he made the switch. Nevertheless, there is nothing criminal about using a paper logbook. Officer French even testified, "[I]n the commercial motor vehicle world, you see a lot of drivers hiding time because they have a time line; they can only drive 11

13

hours a day. It's not something that just jumped out at me all of a sudden saying, Hey, this is a smuggler. There's drivers out there that try to conceal time. It's not anything criminal." Additionally, Chung testified about the detailed notes he makes in his logbook. His interpreter explained that Chung "records how much gas he spends on each trip, how many miles he's been and state and what interstate he's been to." He also details other expenses, such as how much he spends on food, fuel, parts, weighing stations, and his phone bill. If Chung were truly involved in drug interdiction as the State posits, it seems illogical that he would record his activities and whereabouts with such detail.

¶22. Regarding the packaging of the currency, Chung revealed that he does not have a home, so he keeps his savings with him at all times. Chung's interpreter testified that the money was divided into $5,000 sets because it "fits perfectly . . . in his bag. He changes it to hundred dollar bills and put it in. He can count the envelope[s]. [It's] [e]asy for him to just kind of stack them. And that's the way he had been saving." The money was divided into forty-five envelopes, many of them containing his Korean bank's logo. Many of the envelopes looked older and more tattered and discolored compared to others, which Chung argued was proof that he had them stored in the bag for quite some time. These observations comport with Chung's theory that he had been saving his money since 2010. When examining the envelopes at trial, Officer French even admitted that Chung's theory was plausible and he could not provide an alternative theory for why the envelopes were in that condition:

14

Q. Would you agree that a lot of those envelopes are printed envelopes from a bank?

A. Some of them are, yes, sir.

Q. And some of them aren't? Some of them aren't. Correct?

A. Correct.

Q. Would you agree some of them look older than others?

A. Some of them do.

Q. Some of them are stained or have got grease on them or something, some of them don't?

A. Yes, sir.

Q. Wouldn't that support Mr. Chung's story that he had gathered the money and those envelopes over a period of time?

A. I don't know when those envelopes – where they've been. I've seen drug currency packaged in a variety of ways.

Q. Okay. But he said he accumulated that over a period of time. Right?

A. Yes, sir.

Q. And does not the fact that you've got these different kinds of envelopes -- some older, some newer, some discolored, some not, some scribbled on -- support the idea he didn't go pick up those envelopes at one time in one place?

A. It could.

Q. Okay.

A. But it could also be -- be another theory on it. I don't know where he got the envelopes from.

Q. You said there could be another theory on it. Do you have one?

15

A. I don't.

The dissent argues that "[d]espite having an account at the nation's second-largest bank, Chung testified that he carried $225,000 in cash in a duffel bag because '[h]e's on the road all the time' and 'can't stop somewhere and cash [a] check or anything.'" *Post* at ¶39. However, there is nothing criminal about Chung's preferred method of saving or his desire to have immediate access to the money he earned. Chung chose to keep his money in his possession and control. It was readily available to him because it was kept in the place where he resided: his truck. Although this method may seem unconventional, it does not make him a drug courier.

¶23. Chief McLendon and Officer French also alleged that Chung gave inconsistent accounts regarding why he was saving the money. They claimed that he initially told them he had the money for repairs and then later explained that he was saving the money to buy a new truck. However, Chung explained that the money served both purposes. His interpreter testified, "He's been saving this money to buy [a] new truck because it keeps breaking down, and also part of it to use in case he breaks down. [H]e doesn't have credit so he has to pay cash." Additionally, Chung testified about his practice of saving money throughout his time in the United States. He saved money for several years working as a janitor to move to California for trucking school. After obtaining his license and working for a trucking company for several years, he saved enough money to buy his own truck and become an owner-operator in 2010. Then, he immediately began saving again so that he

16

could have enough cash in the event his truck needed repairs and so he could eventually buy a new truck.

¶24. Officer French also alleged that Chung wiped his phone before allowing them to inspect it. He testified that when he received Chung's phone, there were only calls and messages from that day. He also claimed that he observed Chung making a phone call in his truck, but did not see that phone call when he conducted the inspection. This led him to believe that Chung had deleted information from his phone. At trial, Chung's interpreter explained, "[H]e deletes daily. While he's driving when he gets calls, he gets confused, so he deletes daily . . . so he can start over every day. . . . He has too many calls and he don't know who to call or who called him." This is plausible considering he is an owner-operator who has to constantly be in contact with dispatchers, brokers, and businesses. Furthermore, the State offered no evidence confirming that Chung had deleted information from his phone.

¶25. Regarding the drug detection test conducted by the narcotics canine, our Supreme Court has held that dog sniffs are entitled to probative weight. *See Evans v. City of Aberdeen*, 926 So. 2d 181, 185 (¶11) (Miss. 2006). However, the circumstances reveal that there was some doubt surrounding the credibility of the test. Officer French claimed that Voodoo displayed a JND after sniffing the box that contained the money. The video in the record reveals that Voodoo stood by the box containing the money for mere seconds longer than the other two boxes. However, this does not align with the training that Deputy Shack explained at trial. Deputy Shack testified that when canines are alerted to drugs, they will

17

"sit, or they can stand there and stare at it or . . . scratch." However, Deputy Shack acknowledged that Voodoo did not do any of these actions on the day in question. He simply "hung around" the box containing the money for a few seconds.

### 2. Financial Information

¶26. The State also focused heavily on Chung's financial information that he submitted during discovery. Chung submitted his tax returns from 2017, 2018, and 2019; his bank records; and his check stubs from 2015 to 2020. The State specifically argued that Chung's tax returns and bank records were questionable because Chung's income seemingly did not align with the theory that he had been saving since 2010, and he failed to report a bank account.

¶27. Regarding Chung's tax returns, the State only requested that Chung submit his tax returns for the previous three years. The record reveals:

> In 2017, Chung reported a total income of $46,396.00 with an adjusted gross income of $43,118.00 and owed $11,673.00 in federal taxes.

> In 2018, Chung reported a total income of $55,121.00 with an adjusted gross income of $51,227.00 and owed $11,577.00 in federal taxes.

> In 2019, Chung reported a total income of $32,431.00 with an adjusted gross income of $28,514.00 and owed $5,972.00 in federal taxes.

These figures only prove that in three years, Chung profited $93,637. The tax returns reveal that Chung writes off most of his expenses, such as food and gas costs. Furthermore, Chung testified that he lives in his truck, which implies that he has few expenses. Taking this into consideration, it is plausible that Chung could save a significant portion of his income each

18

year over the course of a decade.

¶28.   At trial, it was also revealed that Chung had two accounts, despite previously representing in his interrogatory answers that he had one account.  The State claimed that this proved that Chung lied in efforts to hide a second account.  The interrogatory read:

> Interrogatory No. 15: Identify any bank, savings and loan association, credit union, money market, stock, bond, or mutual fund account, or crypto currency account, along with the corresponding account number, in which you held any interest in the **last five years (2015-2020)**.

(Emphasis added).  Chung reported only his Bank of America Account in his response.  After the State accused Chung of lying, Chung's interpreter explained that the reported account was opened a "long time ago," and the second account was opened "not long ago."  Chung specifically told her that the second account was opened "sometime during [the] pandemic . . . 2021 or [2020]."  The interrogatory specifically requested accounts that had been opened "in the last five years 2015-2020."  The second account could have been opened after the time period described in the interrogatory.  However, the State automatically assumed that this difference was an intentional misrepresentation.  While the court may have found that this made Chung less credible, this was still not enough evidence to prove that the money was somehow connected to an illegal narcotics trafficking scheme.

¶29.   Lastly, the State directed much attention to the fact that Chung's account did not have significant activity before the stop, which took place in September 2020.  Chung's bank account balance in November 2020 was $5,047.58.  His balance in December 2020 changed to $15,985.32.  Chung explained that after the State stripped him of his entire life savings,

he began depositing his money into his account. The record also reveals that in September 2020, Chung made over $12,000. Considering his heightened angst about keeping cash in his truck and his monthly income, a balance increase from $5,047.58 to $15,985.32 is not so alarming.

### 3. Drug Enforcement Administration (DEA) Investigations

¶30. Lastly, the evidence and testimony regarding the DEA cases was the only evidence the State presented in an attempt to connect Chung to drug trafficking. After his money was seized, Chung provided Officer French with his phone number and an additional phone number. Officer French later collected phone tolls showing that this additional number had been in contact with a known drug trafficker in New York. These phone calls took place five months before the stop in question.

¶31. In the circuit court's findings of fact and conclusions of law, the court erroneously wrote that "Chung maintained contact with a known drug trafficker" and that his "number had been in contact with the known drug trafficker 56 times within a short while." There was no evidence offered at trial showing that Chung had been in contact with this drug trafficker. There was no evidence showing how the owner of the additional number was connected to Chung. Furthermore, there was no testimony or details concerning this "known" drug trafficker. Officer French even admitted at trial that Chung had never been in contact with the alleged drug trafficker:

> Q. I understand what you're saying. I'm just asking you to acknowledge, whatever you got, whatever you gathered from Homeland, DEA or Cellebrite's

20

report don't show calls from Mr. Chung's cell phone number to Mr. Estrella [the New York drug trafficker] or back the other way around?

A. No, sir.

The State simply offered the phone tolls and argued that because Chung provided the phone number of someone who was in contact with a drug trafficker, Chung was somehow also connected to this drug trafficker[10] that he had never been in contact with. In an attempt to try to further bridge the gap between Chung and the drug trafficker, the State introduced evidence that Chung had a New York decal on his truck at the time of the stop. However, it is quite plausible that Chung has had to previously drop freight off in New York, considering it is a major transportation hub and has one of the highest freight volumes in the country.

¶32. Officer French also received a deconfliction notice from the agent who was investigating a suspected drug trafficker in New Jersey. Chung and the suspect had the same phone number and address listed on SAFER. However, Officer French admitted that this same address and number was associated with an insurance agent who works with several trucking companies in California. He testified, "[I]f you run that number, it comes back to . . . probably around 30 or so [trucking companies]." We find that this guilt-by-association argument is simply not persuasive. The flaw in this theory was pointed out during cross-

---

[10] It is important to note that this "drug trafficker" was only being investigated by a detective in New York. The record contains no evidence that he was ever convicted and the State did not go into further detail during trial regarding an update on that particular case.

examination:

> Q. One of those 30 companies, trucking companies, was a trucking company involved somehow in a DEA investigation in New York. Right?
>
> A. An HSI, Homeland Security Investigation, in New York, yes.
>
> Q. Okay. But that doesn't mean Mr. Chung's company, being one out of 30, had anything to do with that DEA investigation, does it?
>
> A. I have no idea.
>
> Q. Okay. I just want to be clear. When you've been using the phrase "associated with," what you mean is there was a large number of companies and an insurance agent that has a similar contact information, and one of them is a company that was involved in something in New York?
>
> A. Correct.
>
> Q. But not Mr. Chung's company?
>
> A. It wasn't Mr. Chung's company.

¶33. We find that the State's theory is not supported by the evidence in this case. There were no weapons, drugs, drug paraphernalia, or any other item associated with drug trafficking found in Chung's truck after two searches conducted by Officer French. There was no evidence presented that Chung had ever been involved in any drug activity. There was no evidence or testimony confirming a solid connection between Chung and the purported drug traffickers in New York and New Jersey. Despite what was represented in the findings of fact and conclusions of law, the record confirms that Chung has never been in contact with these individuals. Furthermore, there was no evidence presented by the State to prove that the $225,000 was intended to be furnished in exchange for drugs or were the

22

proceeds of a drug deal. To take these remote connections and conclude that Chung is a drug courier, without more, would be pure speculation. This Court has already established that mere speculation is not sufficient to establish a connection between money and illegal drug trafficking. *Ruiz*, 227 So. 3d at 1136 (¶17); *see also One Hundred Seven Thousand Dollars ($107,000.00) U.S. Currency (Tagle)*, 643 So. 2d at 922 ("The forfeiture may be based wholly on circumstantial evidence and inference. However, mere suspicion with record evidence is inadequate to support a forfeiture."). Here, the State failed to prove that Chung was tied to any drug activity or that his money was going to be used in violation of our controlled substances laws. Given all the evidence taken together, a rational trier of fact could not have found by a preponderance of this evidence that Chung possessed the money with the intent for use in connection with an illegal narcotics trafficking scheme. Accordingly, we find reversal is proper here.

## CONCLUSION

¶34. While we recognize that $225,000 is a large amount of money and gives rise to understandable suspicions, the suspicions, without more, are not enough to hold that the money was forfeitable pursuant to section 41-29-153. Here, we cannot say that the evidence proved it was more likely than not that Chung possessed the currency with the intent to use it in connection with an illegal narcotics trafficking scheme. Chung gave plausible explanations for these suspicions, and the State presented insufficient evidence to actually demonstrate a connection between Chung and drug activity. The State failed to meet its

23

burden of proof, and the circuit court erred in forfeiting the funds to the Brandon Police Department. Therefore, we reverse and render the circuit court's judgment and order the funds returned to Chung.

¶35. **REVERSED AND RENDERED.**

**BARNES, C.J., McDONALD, McCARTY AND SMITH, JJ., CONCUR. WILSON, P.J., DISSENTS WITH SEPARATE WRITTEN OPINION JOINED BY CARLTON, P.J., LAWRENCE AND EMFINGER, JJ.**

**WILSON, P.J., DISSENTING:**

¶36. A forfeiture proceeding "is not a criminal prosecution," and the law only requires "the State [to] prove all facts requisite to the forfeiture by a preponderance of the evidence." *Hickman v. State ex rel. Miss. Dep't of Pub. Safety*, 592 So. 2d 44, 45-46 (Miss. 1991) (quotation marks omitted). That is, "[t]he State must prove that it is more likely than not that the currency was possessed by the claimant with the intent to be used in connection with an illegal narcotics trafficking scheme." *Jones v. State ex rel. Miss. Dep't of Pub. Safety*, 607 So. 2d 23, 29 (Miss. 1991). "The forfeiture can be based on wholly circumstantial evidence and inference." *Id.* Indeed, "a connection with narcotics trafficking can stem from the sheer quantity of currency." *Id.* "As in any civil action, the trier of facts may act on circumstantial as well as direct evidence, and, in the end, confronts the question, whether the evidence preponderates in the plaintiff's favor, that is, produces rational belief that the factual predicates of the plaintiff's claims are more likely true than not." *Hickman*, 592 So. 2d at 46 (citations omitted).

24

¶37. Moreover, "[o]ur scope of review is the familiar substantial evidence/clearly erroneous test." *Id.* "The question is not how we would have resolved the evidentiary and ultimate fact disputes had we been the triers of fact, but whether, given the record, a reasonable fact-finder may have done as was done." *Id.* "This standard substantially limits appellate review of the facts, save only where the circuit court has applied an erroneous legal standard to decide the question of fact." *Id.* "In civil forfeiture cases, the question is, given all of the evidence considered together, a *rational trier of fact* may have found *by a preponderance of the evidence* that the defendant's property was the product of or an instrumentality of violations of this state's controlled substances act." *Lewis v. State*, 199 So. 3d 1245, 1250 (¶10) (Miss. 2016) (emphasis added) (quotation marks and brackets omitted).

¶38. In this case, there was sufficient circumstantial evidence for a rational trier of fact to infer and find by a preponderance of the evidence that the $225,000 cash found in a duffle bag in Chung's commercial motor vehicle was the product of or intended for use in connection with drug trafficking. Chung's explanations for keeping such a large sum of cash in his truck shifted suspiciously over time. When he was stopped, Chung initially denied having a "large sum" of money in his truck. Later, however, Chung admitted that he had over $100,000 in the truck and stated that it was for "repairs" to the truck. Still later, Chung told officers that the $225,000 was his "life savings."

¶39. At the time of the traffic stop, Chung owned a Bank of America account with a

balance of approximately $5,198.37. Despite having an account at the nation's second-largest bank, Chung testified that he carried $225,000 in cash in a duffel bag because "[h]e's on the road all the time" and "can't stop somewhere and cash [a] check or anything."

¶40. After the funds were seized, Chung gave the officers two contact numbers. A DEA agent advised that one of those numbers had been in contact with Pedro Estrella, a known drug trafficker in the New York/New Jersey area, fifty-two times in seventeen days. All the calls were made outside normal business hours, and forty-five of the calls lasted less than two minutes. In addition, the U.S. Department of Homeland Security advised that the phone number associated with Chung's U.S. Department of Transportation number was also associated with another trucking company that had been involved in a large drug bust in the New York/New Jersey area in which 1,200 pounds of marijuana was seized. Chung's truck bore fuel and tax stickers indicating that he had operated in New York and New Jersey.

¶41. Following the traffic stop, a well-qualified narcotics detect dog (Voodoo) and his handler (Deputy Tony Shack) met Sergeant Joseph French at the Brandon Amphitheater. Three empty boxes were set out and "proofed"—i.e., Voodoo showed no interest in any of the boxes. Then, outside the presence of Voodoo and Shack, the seized funds were placed in one of the three boxes. Voodoo was shown the boxes again and still did not "alert to" any of them. However, Voodoo repeatedly showed "interest" in or a "just noticeable difference" to the box containing the seized funds, while he continued to show no interest in the other two boxes. Based on Voodoo's interest in only one box, Shack "felt confident" that the box

26

contained currency with drug residue.[11]

¶42. While French and Chung were at the Brandon Amphitheater, French examined Chung's phone with Chung's consent. When French examined the phone, it appeared that Chung had recently deleted all calls and text messages from the phone, including a call that French had observed Chung make while they were at the Amphitheater.

¶43. Chief Nick McLendon of the Richland Police Department testified as an expert in the field of drug trafficking. McLendon testified that Chung "[a]bsolutely" "fit [the] drug courier profile" based on a number of different facts and the totality of the circumstances. In addition to the evidence above, McLendon noted that Chung was using paper logbooks, which are easier to manipulate than electronic logbooks that use GPS. McLendon also noted that French had stopped Chung about a year earlier and that at that time, Chung was using an electronic logbook with his GPS turned *off*, which also caused French to suspect criminal activity. McLendon also testified that Chung's route along Interstate 20 (I-20) was typical of narcotics trafficking, explaining that I-20 is "a major drug trafficking interstate from the West Coast to the East Coast. . . . [E]astbound is usually the narcotics load trying to get to East Coast while your money returns westbound headed back down to the West Coast . . . ." Here, Chung drove east from California to Georgia, made a turnaround in the Atlanta area,[12]

---

[11] *See Evans v. City of Aberdeen*, 926 So. 2d 181, 185 (¶11) (Miss. 2006) (holding "that dog alerts to currency are entitled to probative weight").

[12] Chung delivered a load in West Point, Georgia, about eighty miles southwest of Atlanta. Because Chung used only a paper logbook, we do not know his precise movements.

and then was stopped on his return trip west to California. McLendon testified that California and Atlanta are both major narcotics distribution hubs. McLendon also testified that "excessive downtime" near drug distribution hubs is indicative of a drug courier. Here, Chung's paper logbook showed one day of downtime in Demopolis, Alabama, before he continued into Georgia. Again, because Chung was using only a paper logbook, we cannot know his precise movements during that downtime. Chung's paper logbook also showed three days of downtime before he departed from California.

¶44. The majority repeatedly states that Chung provided "plausible" explanations for various suspicious circumstances and pieces of circumstantial evidence. *See ante* at ¶¶19, 22, 24, 27, 31, 34. However, it is for the trial court, *not this Court*, to determine whether a "plausible" explanation is *credible*. *See, e.g.*, *Phillips v. City of Oxford*, 368 So. 3d 317, 323 (¶20) (Miss. 2023) (In a bench trial, "the circuit court, in its role as the finder of fact, has the sole authority for assessing witness credibility." (quotation marks omitted)). As stated above, our standard of review is narrow and deferential to the trial court, and we may not re-weigh the evidence. *Hickman*, 592 So. 2d at 46. "The question is not how we would have resolved the evidentiary and ultimate fact disputes had we been the triers of fact . . . ." *Id.* Rather, "the question is, given all of the evidence considered together, a *rational trier of fact* may have found *by a preponderance of the evidence* that the defendant's property was the product of or an instrumentality of violations of this state's controlled substances act." *Lewis*, 199 So. 3d at 1250 (¶10) (emphasis added) (quotation marks and brackets omitted).

28

¶45.    Here, "all . . . the evidence considered together" includes Chung's shifting and suspicious explanations for keeping $225,000 in a bag in his truck instead of his Bank of America account; fifty-two phone calls between a contact number that Chung himself provided and a known drug trafficker; Voodoo's noticeable interest in the box containing the seized funds; Chung's use of a paper logbook and his downtime near drug distribution hubs; Chung's possession of $225,000 while driving west on "a major drug trafficking interstate"; and Chief McLendon's expert testimony that Chung "[a]bsolutely" "fit [the] drug courier profile."  Considered together, this was sufficient evidence for "a rational trier of fact" to infer and find "by a preponderance of the evidence" that the cash "was the product of or an instrumentality of" drug trafficking.  Accordingly, the judgment of the circuit court should be affirmed, and I respectfully dissent.

**CARLTON, P.J., LAWRENCE AND EMFINGER, JJ., JOIN THIS OPINION.**