**IN THE SUPREME COURT OF MISSISSIPPI**

**NO. 2023-CT-00362-SCT**

*RAE YOUNG CHUNG*

*v.*

*STATE OF MISSISSIPPI EX REL. BRANDON
POLICE DEPARTMENT*

**ON WRIT OF CERTIORARI**

| | |
|---|---|
| DATE OF JUDGMENT: | 02/23/2023 |
| TRIAL JUDGE: | HON. DEWEY KEY ARTHUR |
| TRIAL COURT ATTORNEYS: | RICHARD POOLE NOEL, III |
| | GARRISON MICHAEL WHITE |
| | CHRISTOPHER TODD McALPIN |
| | MICHAEL SHELTON SMITH, II |
| | JOHN K. BRAMLETT, JR. |
| | STEVEN CRAIG PANTER |
| COURT FROM WHICH APPEALED: | RANKIN COUNTY CIRCUIT COURT |
| ATTORNEY FOR APPELLANT: | STEVEN CRAIG PANTER |
| ATTORNEYS FOR APPELLEE: | MICHAEL SHELTON SMITH, II |
| | CHRISTOPHER TODD McALPIN |
| NATURE OF THE CASE: | CIVIL - OTHER |
| DISPOSITION: | THE JUDGMENT OF THE COURT OF APPEALS IS REVERSED. THE JUDGMENT OF THE CIRCUIT COURT OF RANKIN COUNTY IS REINSTATED AND AFFIRMED - 10/30/2025 |
| MOTION FOR REHEARING FILED: | |

**EN BANC.**

**BRANNING, JUSTICE, FOR THE COURT:**

¶1.     During a commercial-motor-vehicle stop, the Brandon Police Department discovered

and seized $225,000.  After a hearing on the petition for forfeiture, the trial court entered an

1

order of forfeiture, finding that the seized currency was more likely than not used in connection with an illegal drug-trafficking scheme in violation of the Mississippi Uniform Controlled Substances Law. In a five-to-four split opinion, the Court of Appeals reversed the trial court's judgment, finding that the State failed to meet the burden of proof required in civil-forfeiture proceedings. *Chung v. State ex rel. Brandon Police Dep't*, 412 So. 3d 311, 323 (Miss. Ct. App. 2024). Upon review, however, we find that sufficient evidence supports the trial court's decision; therefore, we reverse the judgment of the Court of Appeals, and we reinstate and affirm the judgment of the trial court.

## FACTS AND PROCEDURAL HISTORY

¶2. On September 23, 2020, Lieutenant Joseph French of the Brandon Police Department stopped a westbound commercial motor vehicle (CMV) driven by Rae Young Chung on Interstate 20 in Rankin County after observing the vehicle speeding and following other vehicles too closely. During the stop, Lieutenant French asked for Chung's bills of lading, driver's license, and logbooks. Chung's bills of lading indicated that he had initially traveled east from California to Georgia. Lieutenant French noticed that Chung was using paper logs as opposed to the electronic logs or an electronic logging device (ELD) typically used by CMV drivers. Chung explained that he was using paper logs that day because his GPS had stopped working. When Lieutenant French ran Chung's information through dispatch, he realized that he had stopped Chung one year before, in September 2019. At that time, Chung had also been using paper logs, and he stated the same reason. Lieutenant French testified

2

that based on his training and experience, the use of paper logs was one possible indicator of ongoing criminal activity due to the ease of manipulation of travel routes. Upon review of the logbook, Lieutenant French noticed time discrepancies in several entries, as well as several entries showing Chung as either off duty or traveling without freight. All of these combined factors increased his suspicions.

¶3.     Lieutenant French then asked Chung if he was hauling anything illegal, such as weapons, drugs, or money, and Chung replied that he was not. He asked Chung once more, and Chung then indicated that he had a small amount in the vehicle. Lieutenant French testified that he then realized "there was a language barrier a little bit," so he began using Google Translate to communicate with Chung. At trial, Chung confirmed that he and Lieutenant French were able to communicate well during the stop.

¶4.     When Lieutenant French asked again if Chung had any weapons, drugs, or money in the CMV, Chung confirmed that he had more than $100,000 in the vehicle, stating that it was for truck repairs. At trial, Lieutenant French testified that "based off all the other factors with the logbooks, the inconsistencies in it, [Chung's] admitting that he had money inside of the vehicle, now everything started looking more like [Chung] was a drug money courier at that point in time." Lieutenant French asked to search the vehicle, and Chung consented to the search. During the search, Lieutenant French discovered a bag containing forty-five to forty-eight envelopes, with $5,000 in each envelope, totaling $225,000. Later during the stop, Chung stated that the money was not for truck repairs but instead that it was his life

savings from 2014 to the present.

¶5.     During the stop, Lieutenant French asked Chung to follow him to the Brandon Amphitheater to continue the investigation.  At the Amphitheater, Lieutenant French observed Chung making a phone call and then asked to search Chung's phone.  Chung consented and provided Lieutenant French with one phone—his cell phone. Lieutenant French then conducted a forensic examination on the phone and discovered that several calls and text messages had recently been deleted.

¶6.     At that point, Lieutenant French requested the assistance of a trained narcotics canine. Deputy Tony Shack from the Rankin County Sheriff's Office brought his certified canine, Voodoo, to the Amphitheater.  At trial, Deputy Shack testified that he trains with Voodoo regularly and that Voodoo had been trained to alert for narcotics.  At the Amphitheater, Lieutenant French placed three empty boxes for Voodoo to sniff in order to "proof" the boxes to confirm that they were empty.  Deputy Shack testified that Voodoo showed no interest in the empty boxes, confirming that they were empty.   Lieutenant French then allowed Deputy Shack and Voodoo to leave the area before placing the currency in one of the three boxes.  Deputy Shack and Voodoo returned to the area so that Voodoo could sniff the three boxes again.  This time, demonstrated interest in "Box 1," which contained the currency.  Deputy Shack testified that Voodoo's interest was called "Just Noticeable Difference," or JND, which likely indicates a slight odor of a controlled substance.

¶7.     At the end of his investigation, Lieutenant French seized the $225,000. He then asked

Chung for "a good contact number," and Chung provided two phone numbers—his cell phone number and a second number. Lieutenant French later discovered that the second number provided as a "good contact number" was associated with an ongoing DEA drug-trafficking investigation, which involved the movement of large amounts of narcotics into New York using CMVs. Shortly thereafter, Lieutenant French was contacted by Homeland Security Investigations (HSI) about a third phone number associated with Chung's DOT number, which was linked to an insurance agent connected to several trucking companies in California. One of the trucking companies had been the subject of an HSI investigation in New York and New Jersey; one week later, HSI seized 1,200 pounds of marijuana and more than $400,000 being transported by a CMV as a result of this investigation. At trial, pictures of Chung's CMV were entered into evidence. Notably, Chung's CMV had New York tax stickers on the bumper, indicating that he had traveled into and out of New York.

¶8. The State filed its petition for forfeiture, which Chung contested. On November 29, 2022, the circuit court conducted a bench trial, which included testimony from Lieutenant French, Deputy Shack, and Chung. Chief Nick McLendon with the Richland Police Department also testified on behalf of the State as an expert in criminal interdiction and drug trafficking. In February 2023, the circuit court issued its findings of fact and conclusions of law and also issued an order of forfeiture.

¶9. Aggrieved, Chung filed his appeal, which was assigned to the Court of Appeals. In a five-to-four split opinion, the Court of Appeals reversed the trial court's decision, finding

that the State failed to meet its burden of proof under Mississippi Code Section 41-29-153. *Chung*, 412 So. 3d at 312. The State subsequently filed its petition for writ of certiorari, which this Court granted.

## STANDARD OF REVIEW

¶10.    "The appropriate standard of review in civil forfeiture cases is the familiar substantial evidence/clearly erroneous test." *Six Thousand Dollars ($6,000) v. State ex rel. Miss. Bureau of Narcotics*, 179 So. 3d 1, 4 (Miss. 2015) (internal quotation mark omitted) (quoting *Galloway v. City of New Albany*, 735 So. 2d 407, 410 (Miss. 1999)). A circuit court's findings will remain undisturbed "unless it has applied an erroneous legal standard to decide the question of fact." *Id.* (internal quotation mark omitted) (quoting *Galloway*, 735 So. 2d at 410). Lastly, because the circuit court sits without a jury in civil-forfeiture cases, this Court gives it "the same deference as a chancellor, [and] his or her findings will not be overturned if supported by substantial evidence." *Singley v. Smith*, 844 So. 2d 448, 451 (Miss. 2003) (citing *Maldonado v. Kelly*, 768 So. 2d 906, 908 (Miss. 2000)).

## DISCUSSION

¶11.    This case presents the question of whether the seized currency was forfeitable under our civil-forfeiture statutes. With the above standard of review in mind, we find no error in the trial court's decision.

¶12.    First, we address the issue of whether the traffic stop exceeded the constitutionally permissible time under *Illinois v. Cabellas*, 543 U.S. 405, 125 S. Ct. 834, 160 L. Ed. 2d 842

6

(2005), and ***Rodriguez v. United States***, 575 U.S. 348, 135 S. Ct. 1609, 1614-15, 191 L. Ed. 2d 492 (2015).  Chung argues that the length of the stop exceeded the time required to complete the purpose of the stop, which was the writing of a warning ticket.  He further argues that, as a result, all evidence obtained after that point should have been excluded.  We disagree.

¶13.    The Fourth Amendment of the United States Constitution prohibits unreasonable searches and seizures.  In ***Rodriguez***, the United States Supreme Court reiterated its holding from ***Caballes*** ten years before, stating that "[a] seizure justified only by a police-observed traffic violation, therefore, becomes unlawful if it is prolonged beyond the time reasonably required to complete the mission of issuing a ticket for the violation." ***Rodriguez***, 575 U.S. at 350-51 (citation modified) (citing ***Caballes***, 543 U.S. at 407).  This Court has also recognized this same constitutional prohibition, holding that a police officer has probable cause to stop a person for traffic violations only for as long as necessary to issue a citation. ***Martin v. State***, 240 So. 3d 1047, 1054 (Miss. 2017).  But we also highlighted the caveat discussed by the United States Court of Appeals for the Fifth Circuit, which held that "[i]f the officer develops reasonable suspicion of additional criminal activity during his investigation of the circumstances that originally caused the stop, he may further detain its occupants for a reasonable time while appropriately attempting to dispel this reasonable suspicion." ***Id.*** (internal quotation mark omitted) (quoting ***United States v. Pack***, 612 F.3d 341, 350 (5th Cir. 2010)).

7

¶14.     The original purpose of the stop was for speeding and tailgating, and Chung has not disputed that Lieutenant French had probable cause to conduct the stop. Initially, Lieutenant French indicated that he would write a warning ticket. But he testified that he noticed Chung using paper logs instead of electronic logs, an indicator common in drug trafficking. Chung explained that his ELD's GPS feature was not working. Moments later, while running Chung's driver's license, Lieutenant French also noticed that he had stopped Chung one year before. At the previous stop, Chung also had been using paper logs, and he used the same explanation. Lieutenant French also observed several discrepancies in Chung's paper logbook regarding his travel time and down time. Based on the totality of circumstances, we find an expanded investigation justified due to Lieutenant French's reasonable suspicion of criminal activity.

¶15.     Second, Chung argues that his consent to search was not voluntary. But the record indicates that Chung verbally consented to the search, and because Chung did not first raise the issue with the trial court, we find the argument to be without merit. *See Fitch v. Valentine*, 959 So. 2d 1012, 1021 (Miss. 2007) ("Issues not raised at trial cannot be raised on appeal.")

¶16.     Next, we address the issue of whether the money was forfeitable. Mississippi law prohibits the "[sale], barter, transfer, manufacture, distribute, dispense or possess with intent to sell, barter, transfer, manufacture, distribute, or dispense, [of] a controlled substance" by any person. Mississippi Code Section 41-29-139(a)(1) (Rev. 2018). In addition, the following

are subject to  forfeiture:

> (5) All money . . . which [is] used, or intended for use, in violation of this article or in violation of Article 5 of this chapter or Chapter 137 of this title;
>
> . . . .
>
> (7) Everything of value . . . in exchange for a controlled substance in violation of this article, all proceeds traceable to such an exchange, and all monies, negotiable instruments, businesses or business investments, securities, and other things of value used, or intended to be used, to facilitate any violation of this article. . . .

Mississippi Code Section 41-29-153 (Rev. 2018).  While a connection between the seized currency and the illegal activities is required, "[t]his is *not* a criminal prosecution.  It is a [civil] forfeiture proceeding." ***Hickman v. State ex rel. Miss. Dep't of Pub. Safety***, 592 So. 2d 44, 45 (Miss. 1991).  The important difference is that civil-forfeiture proceedings require a preponderance of the evidence rather than the beyond-a-reasonable-doubt burden required in criminal prosecutions.  *Id.* at 46.  The State satisfies its burden by proving that the seized currency was *more likely than not* used in connection with an illegal drug-trafficking scheme, and thus, subject to forfeiture.  ***Jones v. State ex rel. Miss. Dep't of Pub. Safety***, 607 So. 2d 23, 29 (Miss. 1991). "The forfeiture can be based wholly on circumstantial evidence and inference." *Id.* (citing ***Reed v. State***, 460 So. 2d 115, 118) (Miss. 1984)).  On review, this Court must determine whether a rational trier of fact, when considering all of the evidence together, "may have found by a preponderance of the evidence that the funds were the product of or instrumentalities of violations of this state's controlled substances act." ***Lewis v. State ex rel. Lamar Cnty. Sheriff's Dep't***, 199 So. 3d 1245, 1250 (Miss. 2016) (internal

9

quotation mark omitted) (quoting *Hickman*, 592 So. 2d at 48). "This standard substantially limits appellate review of the facts, save only where the circuit court has applied an erroneous legal standard to a question of fact." *Hickman*, 592 So. 2d at 46 (citing *McClendon v. State*, 539 So. 2d 1375, 1377 (Miss. 1989)). "The question is not how we would have resolved the evidentiary and ultimate fact disputes had we been the triers of fact, but whether, given the record, a reasonable fact-finder may have done as was done." *Id.*

¶17. In its twelve-page findings of fact and conclusions of law, the trial court detailed all of the State's evidence and listed numerous factors it considered as the basis for its decision. The trial court included several factors identified by Chief McLendon as indicators of possible drug trafficking in this case, such as:

    a.     The westbound direction of travel on Interstate 20 from Georgia to California, both known as hubs for drug distribution and trafficking, with a turnaround in the Atlanta area;

    b.     The paper logbooks, which are easily manipulated and gave Sgt. French suspicion of criminal activity;

    c.     The fact that on a previous occasion, Sgt. French stopped Chung, who was found to be using electronic logs with the GPS feature turned off, which also gave Sgt. French suspicion of criminal activity;

    d.     The packaging of the currency in 45 separate $5,000.00 envelopes, which make it easy to count for quick exchanges;

    e.     The fact that Chung claimed the money was for truck repairs when he had more than enough to purchase two CMVs;

    f.     The deleted calls on [Chung's] cell phone;

    g.     The fact that the number Chung provided was in contact multiple times

10

with a known drug trafficker and target of a DEA investigation;

h.      The fact that the canine showed JND to the currency;

i.      The fact that the DEA/HSI recently busted the same organization in [New York and] New Jersey for moving large amounts of marijuana and currency; and

j.      The fact that the truck had the New York state tax stickers on the front bumper.

¶18.   There is no dispute that Lieutenant French located and seized $225,000, consisting of forty-five envelopes of $5,000 each, after a valid consent to search by Chung. Also, when investigating Chung's paper logs and other information, Lieutenant French noted several concerns about his downtime and destinations' being known drug hubs. Lieutenant French testified to a connection between Chung and a known drug dealer through one of two phone numbers provided by Chung during the traffic stop. More specifically, during the stop, Chung had one cell phone in his possession. And then he provided a second number as a "good contact number." It was from this second phone number that fifty-two calls were made in seventeen days to a known drug dealer in the New York/New Jersey area, and Lieutenant French testified to this second number's being associated with a DEA case out of New York. Then, an HSI agent contacted Lieutenant French and notified him of a third phone number associated with Chung's DOT number.[1] This third number was linked to an

_____

[1] Lieutenant French's testimony about this third phone number is as follows:

[O]n October 7th of 2020, I received a deconfliction notice from an Agent Mason Wilke from Homeland Security Investigations. He had ran the number

11

insurance agent affiliated with numerous trucking companies in California; one of the companies was involved in an HSI investigation in New York and New Jersey, which resulted in the seizure of large amounts of drugs and almost $500,000 in bulk currency transported by a CMV. Also, noteworthy was Chung's traveling westbound with a large amount cash, the New York and New Jersey fuel and tax stickers on his truck, as well as the drug dog showing "interest" in or a "just noticeable difference" to the seized money.[2]

¶19. The State elicited testimony from Chief Nick McLendon, an expert in drug trafficking, who opined that, based on the totality of the circumstances, Chung "absolutely fit the drug courier profile." Chief McLendon reiterated and emphasized several facts that he considered in his analysis including the paper logs, the westbound direction of the truck, the NY and NJ tags, the downtime noted, and the link between a phone number provided as "good contact

associated with Mr. Chung's DOT [number]. When you run the DOT number on SAFER, which was a federal website that is public information, it will show you the address and telephone number for the trucking company. The telephone number came back as a (909) 720-2727. Agent Wilke was conducting an investigation up in New York and ran a DOT number and it came back to the same address and the same telephone number which Mr. Chung's . . . company came back to.

[2] Some confusion exists regarding the drug dog test. To clarify, Deputy Shack testified that he was *continuing* to work on "sitting" as the dog's final alert. ("Well, it would be nice.") But Deputy Shack also read from his own training records for this dog, as a part of his testimony. He testified that the dog would also "stand and stare" sometimes as well. But he did not testify that the dog would only alert those two ways. In fact, his testimony from his training records revealed that the dog would successfully alert Deputy Shack as to the presence of drugs or drug odors, regardless of what behavioral technique the dog used. Also, while much emphasis has been placed on the dog "sitting" or "standing and staring," Deputy Shack continued to testify that a JND was still the dog changing his behavior or "alerting" him to Box 1—the box containing the $225,000.

12

number" and numerous calls with a known drug trafficker.

¶20. The Court of Appeals opined that the trial court did not meet its burden of proof and that "Chung was able to provide the court with plausible explanations to rebut each of these factors." *Chung*, 412 So. 3d at 317. The Court of Appeals compared the present case to one of its previous cases, *Ruiz v. State*, 227 So. 3d 1132 (Miss. Ct. App. 2016), in which the Court of Appeals reversed a trial court's forfeiture award using the same reasoning. *Chung*, 412 So. 2d at 317. The Court explained:

> The Court [of Appeals] found that although many of the facts garnered suspicion of drug activity, none of the evidence presented actually demonstrated that Ruiz was involved in any drug activity. Furthermore, the Court gave much weight to the fact that Ruiz provided plausible explanations to dispel the suspicions raised against him. *The same is true here.*

*Id.* (emphasis added) (citations omitted). We disagree.

¶21. In both *Ruiz* and the present case, the trial courts, sitting as triers of fact, looked at the evidence presented by the State and found that the totality of the circumstances in each case warranted forfeiture. The *Ruiz* Court disagreed with the trial court, finding that "no actual tie between the [forfeited] money and illegal drug trafficking [existed], even when taking the facts as a whole . . . [and that] Ruiz had a plausible explanation for every other question asked of him by the sheriff's department[.]" *Ruiz*, 227 So. 3d at 1136. In our case, however, the record contains numerous pieces of evidence and a detailed findings of fact and conclusions of law, all of which support the trial court's decision.

¶22. Also, this Court has held that the trial court, as fact-finder, has the sole authority to

determine whether a witness's plausible explanations are credible. *Phillips v. City of Oxford*, 368 So. 3d 317, 323 (Miss. 2023). Here, the trial court found that Chung's testimony lacked credibility. Our role as appellate courts requires us only to examine the record to determine if substantial evidence supports this finding, while giving deference to the trial court. *Hickman*, 592 So. 2d at 46. It is not the role of this Court to reweigh the evidence presented at trial but rather to determine if a reasonable trier of fact may have found by a preponderance of the evidence that the claimant's property was the product of or an instrumentality of violations of this state's controlled substances. *Id.* at 48. Accordingly, we find that sufficient circumstantial evidence exists to support the trial court's order of forfeiture based on the applicable law. As such, we find no error and affirm the judgment of the trial court in this case.

## CONCLUSION

¶23. We reverse the judgment of the Court of Appeals, and we reinstate and affirm the judgment of the trial court

¶24. **THE JUDGMENT OF THE COURT OF APPEALS IS REVERSED. THE JUDGMENT OF THE CIRCUIT COURT OF RANKIN COUNTY IS REINSTATED AND AFFIRMED.**

**RANDOLPH, C.J., MAXWELL, CHAMBERLIN AND GRIFFIS, JJ., CONCUR. SULLIVAN, J., DISSENTS WITH SEPARATE WRITTEN OPINION JOINED BY KING AND COLEMAN, P.JJ., AND ISHEE, J.**

**SULLIVAN, JUSTICE, DISSENTING:**

¶25. Forfeiture "is a tool of public protection, a tool of law enforcement and forfeiture is

14

precisely mandated by statute and when the statute is carefully and correctly followed we will favor such forfeiture and when the statute is not followed or supported by necessary evidence we will disfavor such forfeiture." ***One Hundred Seven Thousand Dollars ($107,000) U.S. Currency v. State ex rel. Harrison Cnty. Sheriff's Dep't***, 643 So. 2d 917, 920 (Miss. 1994). But "we can not view forfeiture cases in a vacuum." ***One (1) Charter Arms, Bulldog 44 Special v. State ex rel. Moore***, 721 So. 2d 620, 624 (Miss. 1998). This Court has recognized the need for closer scrutiny in these types of cases due to the fact that the forfeited money benefits the State and the seizing law enforcement agency. ***Id.***[3] To quote Justice Scalia, "[i]t makes sense to scrutinize governmental action more closely when the State stands to benefit." ***Id.*** (quoting ***Harmelin v. Michigan***, 501 U.S. 957, 979 n.9, 111 S. Ct. 2680, 115 L. Ed. 2d 836 (1991) (Scalia, J., plurality opinion)).

¶26.    The Court of Appeals correctly held that Rae Young Chung, a seventy-nine-year-old long-haul trucker with no criminal history, was entitled to retain possession of his life savings seized in a routine traffic stop. ***Chung v. State ex rel. Brandon Police Dep't***, 412 So. 3d 311, 322-23 (Miss. Ct. App. 2024). The court found that the State failed to prove the money was subject to forfeiture as proceeds of the illegal drug trade. ***Id.*** at 323. The majority pieces together scant circumstantial evidence to craft a manner to validate the seizure. Respectfully,

---

[3]*See* Miss. Code Ann. § 41-29-181(2)(a) (Rev. 2023) ("twenty percent (20%) of the proceeds shall be forwarded to the State Treasurer and deposited in the General Fund of the state and eighty percent (80%) of the proceeds shall be deposited and credited to the budget of the participating law enforcement agency.").

I dissent.

¶27. Applying the appropriate standard of review, the Court of Appeals stated explicitly that:

(1) "the record confirms that Chung has never been in contact with" individuals involved in drug trafficking,

(2) "there was no evidence presented by the State to prove that the $225,000 was intended to be furnished in exchange for drugs or were the proceeds of a drug deal[,]"

(3) "[g]iven all the evidence taken together, a rational trier of fact could not have found by a preponderance of this evidence that Chung possessed the money with the intent for use in connection with an illegal narcotics trafficking scheme[,]" and

(4) "[w]hile we recognize that $225,000 is a large amount of money and gives rise to understandable suspicions, the suspicions, without more, are not enough to hold that the money was forfeitable pursuant to [Mississippi Code S]ection 41-29-153."

*Chung*, 412 So. 3d at 322-23. Contrary to the majority's findings, the court did not reweigh the evidence. Rather, it simply determined that the record lacks any evidence that links the seized money to illegal drug activities. Even when disregarding Chung's explanations and relying solely on the State's evidence, the record still fails to establish that the money was used or intended to be used for the trafficking of drugs. Thus, I would find that the State did not present sufficient evidence to prove by a preponderance of the evidence that the seized money was directly tied to or connected to any illegal drug activity, specifically drug trafficking.

¶28. "[T]he State must prove that it is more likely than not that the currency was possessed

16

by the claimant with the intent to be used in connection with an illegal narcotics trafficking scheme."[4] ***$107,000***, 643 So. 2d at 922 (citing ***Reed v. State ex rel. Miss. Bureau of Narcotics***, 460 So. 2d 115, 118 (Miss. 1984)). While "forfeiture may be based wholly on circumstantial evidence and inference," ***id.*** (citing ***Reed***, 460 So. 2d at 118), we have stated that "mere suspicion with record evidence is inadequate to support a forfeiture." ***Id.*** (citing ***Ervin v. State ex rel. Miss. Bureau of Narcotics***, 434 So. 2d 1324 (Miss. 1983)). To determine whether a forfeiture was lawful, this Court "analyze[s] four elements":

(1)     the nexus between the offense and the property and the extent of the property's role in the offense;

(2)     the role and culpability of the owner;

(3)     the possibility of separating the offending property from the remainder; and

(4)     whether, after a review of all relevant facts, the forfeiture divests the owner of property which has a value that is grossly disproportionate to the crime or grossly disproportionate to the culpability of the owner.

***Lewis v. State ex rel. Lamar Cnty. Sheriff's Dep't***, 199 So. 3d 1245, 1251 (Miss. 2016) (quoting ***One (1) Charter Arms***, 721 So. 2d at 625). "[T]he first three elements ensure a sufficiently close relationship between the property and the illegal activity," and "[t]he fourth element protects offenders from forfeitures that are grossly disproportionate to the offense." ***Id.*** (citing ***One (1) Charter Arms***, 721 So. 2d at 625). The test is designed to permit the

---

[4]Only when money has been found within close proximity of the drugs or drug paraphernalia can the trial court presume it is forfeitable. Miss. Code Ann. § 41-29-153(7) (Rev. 2018).

forfeiture of money or property that were used for illegal criminal activity. *See **One (1)** **Charter Arms***, 721 So. 2d at 624. It is not designed to permit forfeiture "where innocent persons will suffer[.]" ***Id.*** In this matter, no evidence shows a nexus or a sufficiently close relationship between the money seized from Chung and drug trafficking.

¶29. The majority disagrees with the Court of Appeals' application of ***Ruiz v. State***, 227 So. 3d 1132 (Miss. Ct. App. 2016), and finds that "sufficient circumstantial evidence exists to support the trial court's order of forfeiture[.]" Maj. Op. ¶ 22. The majority attempts to distinguish ***Ruiz*** from the instant case by stating that "the record contains numerous pieces of evidence and a detailed findings of fact and conclusions of law, all of which support the trial court's decision." Maj. Op. ¶ 21. I disagree. In my opinion, the State has presented even less evidence of a connection to illegal drug activities than it did in ***Ruiz***.

¶30. In ***Ruiz***, while conducting a traffic stop, police discovered and seized $56,000 in cash within a hidden compartment of the vehicle. ***Ruiz***, 227 So. 3d at 1133. In addition to the large amount of cash, the police discovered the following in the vehicle: (1) a vacuum-sealer machine, (2) vacuum-sealer bags, (3) Saran Wrap, (4) two cell phones, (5) a map, (6) a strong scent within the vehicle, (7) two air fresheners hanging from the rearview mirror, and (8) residue, that appeared to be marijuana. ***Id.*** at 1133-34. The court acknowledged that the residue was "the only alleged element that directly indicates illegal narcotics were involved." ***Id.*** at 1137. But it ruled that because of the State's "[f]ailure to collect, test, and preserve the residue for trial rendered it a rather unpersuasive piece of evidence in determining whether

18

the money discovered near the residue was substantially connected to illegal drug trafficking." *Id.* As a result, the court held that:

> While we recognize that many factors in Ruiz's situation give rise to an element of suspicion, we fail to see how the factors in play support a reasonable belief that the totality of the circumstances shows, by a preponderance of the evidence, that the money in question was used in exchange for drugs.

*Id.*[5]

¶31. In Chung's case, no drug trafficking tools were discovered. Nor were there any signs of drugs having been in the truck. Like the driver in ***Ruiz***, Chung was *not*: (1) charged criminally, (2) linked to criminal activities, and (3) listed within the El Paso Intelligence Center (EPIC) database. Additionally, the money was not hidden in a secret compartment. Rather, Chung voluntarily acknowledged the existence of the money and handed the money to the officer. Like in ***Ruiz***, the evidence only creates suspicion; it does not show, by a

---

[5] The majority takes issue with Court of Appeals' decision in ***Chung***, stating that "the [***Ruiz***] [c]ourt gave much weight to the fact that Ruiz provided plausible explanations to dispel the suspicions raised against him. The same is true here." Maj. Op. ¶ 20 (citation omitted) (quoting ***Chung***, 412 So. 3d at 317). The majority seems to think that the court was reweighing the credibility of the explanations given by Chung. *See* Maj. Op. ¶¶ 20-21. First, the ***Ruiz*** court did not base its decision on the explanations given by the owner of the money. Rather, it rationalized that, regardless of any explanation given, no evidence was presented that linked the money to illegal activities. ***Ruiz***, 227 So. 3d at 1137. The court determined that the evidence, at most, created suspicion, which was not enough to warrant seizure of the money. *Id.* Second, this Court denied the State's petition for writ of *certiorari* in which it argued that the Court of Appeals had reweighed the evidence. *See* ***Ruiz v. State***, 223 So. 3d 789 (Miss. 2017) (table). By denying *certiorari*, this Court upheld the Court of Appeals' reasoning in ***Ruiz***, a case that contained more evidence of alleged drug trafficking than the instant case. We should remain consistent and find that Chung's money was not forfeitable under Section 41-29-153.

19

preponderance of the evidence, that the money was used in or for illegal drug activities.

¶32. The evidence that the majority believes is sufficient to warrant forfeiture is: (1) large amount of money, (2) Chung's downtime and destinations' being in known drug hubs, (3) a connection between Chung and a known drug dealer via one of the phone numbers given by Chung, (4) Chung's link to an HSI investigation, (5) Chung's traveling in a westward direction, (6) Chung's possession of New York and New Jersey fuel and tax stickers, and (7) the dog sniff.

¶33. First, the value of currency seized alone does not satisfy the forfeiture statute; rather, there must be proof that shows a connection between the money and illegal drug activities. *See $107,000*, 643 So. 2d at 923 ("There was no proof, other than the large sum of money, in the record to indicate that Tagle fit a drug courier profile."). The trial court determined that given the large sum of money in this case, $225,000, "Chung's explanation of the funds and minimal reported income preponderate heavily against the alleged ownership claim of [Chung]." But the trial court erred by not recognizing that the State limited the scope of Chung's financial information. As discussed by the Court of Appeals, "the State only requested that Chung submit his tax returns for the previous three years." *Chung*, 412 So. 3d at 320. From the record, we know that the seized money was alleged to have been composed of Chung's savings from 2014 to 2020. The State's limited look at his tax returns showed "that in three years, Chung profited $93,637." *Id.* While the State limited itself to only three years of tax returns, Chung admitted his pay stubs from 2014 to 2020 into

evidence, which showed that he had the ability to make several thousands of dollars a month. When one considers the three-year profit of $93,637 in conjunction with the pay stubs from the past six years, the record shows a significant probability that Chung could have earned this money.[6]

¶34.    Neither Officer French nor Chief McLendon placed Chung in a known *drug hub*. Both witnesses testified that Chung had been in Georgia. But neither one of them specified about what city in Georgia or whether it constituted a *drug hub*. While explaining one of the factors Chief McLendon considered when constructing a drug courier profile, *i.e.*, excessive downtime in a source city, he used Atlanta, Georgia, as the example of a source city. But when asked if there was any evidence showing that Chung had been in Atlanta prior to the stop, Chief McLendon stated, "I know Georgia, is all I was told. I don't know where. I didn't see the logbooks or the bills of lading. . . . I don't know where he was at." Later Chief McLendon admitted that "[i]t would have been nice to have the logbooks to look at and see exactly what he was doing during" his downtime. The closest Officer French's testimony

---

[6]It should be noted that Officer French and Chung only effectively communicated via the translation device. At the time of the stop, Chung was a seventy-year-old immigrant from South Korea, who primarily spoke Korean. As the majority notes, there was a "language barrier" between the two. Maj. Op. ¶ 3. This barrier remained until Officer French began using a Google Translate device. Prior to using the device, Chung had told French that there were no weapons, drugs, or currency in his truck. But when the same question was asked via the translation device, Chung acknowledged the presence of the money. Chung never knowingly denied ownership of the money. He also explained that the money was his life savings and that it was intended to be used for truck repairs.

places Chung to Atlanta, Georgia, was Demopolis, Alabama.[7] Simply, no evidence was presented that showed Chung had been in Atlanta, Georgia, or any other known *drug hub* prior to Officer French's stopping him.

¶35. The State failed to establish a connection between Chung's destinations and his alleged time alterations to drug trafficking. Officer French testified that after he discovered that Chung was using paper logs, he became suspicious that Chung might be involved in illegal drug activities. He stated that it appeared to him that the paper logs contained time discrepancies and had been falsified. The State did not admit the paper logs into evidence. The State's own witnesses, however, provided an alternative reasoning for using paper logs and for having time discrepancies within them. Despite giving rise to his suspicions, Officer French testified that time discrepancies are "not anything criminal" because "[t]here's drivers out there that try to conceal time." Chief McLendon's testimony echoed this sentiment by acknowledging that the usage of paper logs does not automatically lead to the assumption of drug trafficking. Also, Officer French and Chief McLendon conceded that the primary reason for the usage of paper logs is to allow drivers to drive more hours than they are permitted to drive. While the usage of paper logs can raise suspicions of illegal activities, the State's own witnesses refuted its attempt to create a connection between drug trafficking and the usage

---

[7]If we consider Chung's explanation about his deliveries and route on the trip, the closest he places himself to Atlanta, Georgia, is West Point, Georgia. As the Court of Appeals pointed out "West Point, Georgia is eighty miles from Atlanta, Georgia. This comparison would be the equivalent of saying McComb, Mississippi, is in the Jackson area." *Chung*, 412 So. 3d at 317.

of paper logs that contain discrepancies in time.

¶36.    The majority agrees with the trial court that the State linked Chung to a DEA case in New York. Maj. Op. ¶¶ 17-18. The majority erroneously states that "French testified to a connection between Chung and a known drug dealer through one of two phone numbers provided by Chung during the traffic stop." Maj. Op. ¶ 18. While issuing Chung a receipt for the seized money, Officer French asked Chung for "a good contact number," to which Chung responded with two different numbers:  (1) one had a 213 area code and ended in 8883, and the other had a 213 area code and ended in 3727.[8] According to French, the phone tolls showed that the DEA target's phone number and John Doe's phone number had made contact fifty-two times in May 2020. Officer French admitted that none of those calls had come from Chung's cell phone. Specifically, he testified that the calls to the DEA target only came "from the number that [Chung] gave me as a contact number," *i.e.*, John Doe's phone. Chief McLendon stated that the connection to the DEA case was important because "[i]t shows the nexus that whoever owned that phone was talking to a known drug trafficker in New York." But the record clearly shows that the owner of that phone was not Chung. The State did not present any evidence that established a link between John Doe and Chung. Nor was there evidence that showed that Chung ever had possession of John Doe's phone.

---

[8]The record shows that the phone number ending in 8883 belonged to another individual, not Chung. For privacy purposes, we will refer to the individual that owned the phone number ending in 8883 as John Doe. The record shows also that the phone number ending in 3727 belonged to Chung and was the phone that he had in his possession on the day of the traffic stop.

Simply, there was no evidence that connected Chung or his cell phone to the DEA case. As the Court of Appeals pointedly stated, "[t]he State simply offered the phone tolls and argued that because Chung provided the phone number of someone who was in contact with a drug trafficker, Chung was somehow also connected to this drug trafficker that he had never been in contact with." *Chung*, 412 So. 3d at 321-22 (footnote omitted). John Doe's phone number's connection to a DEA investigation in no way connects Chung and his money to illegal drug activities.

¶37.   Regarding Chung's supposed connection to a Homeland Security Investigation (HSI), Officer French explained that a HSI agent "was conducting an investigation up in New York and ran a DOT number and it came back to the same address and the same telephone number which Mr. Chung's truck came back–or company came back to." When asked to link the HSI investigation to Chung's case, Officer French stated the following:

> A:    During the investigation, I found that the 909 number was actually a number that goes to an insurance agent, and he's associated with several trucking companies in the California, especially Los Angeles, area. And so if you run that number, it comes back to – I can't remember how many trucking companies, but it was a large number. It was probably around 30 or so.
>
> Q:    Okay. And was one of those companies Mr. Chung's?
>
> A:    One of those companies was Mr. Chung's.

On cross-examination, the following exchange occurred when Chung's attorney asked for clarification about whether Chung's truck was the truck involved in the HSI investigation:

> Q:    Okay. I just want to be clear. When you've been using the phrase

24

"associated with," what you mean is there was a large number of companies and an insurance agent that has a similar contact information, and one of them is a company that was involved in something in New York?

A:     Correct.

Q:     But not Mr. Chung's company?

A:     It wasn't Mr. Chung's company.

The record clearly shows that any connection Chung had to the HSI investigation was via his insurance agent. Chief McLendon attempted to strengthen this connection by testifying:

> [A] lot of times [drug trafficking organizations are] set up like Walmart. It's an organization that is in it to make the money. So you take this number and this address that's linked to this major seizure in New Jersey or New York and it's linked to Mr. Chung by the telephone numbers listed on SAFER and the address, which is listed on SAFER. A lot of these organizations use the same people to set up these same trucks, get the insurance for them, make sure everything is legitimate on the front end so when they are encountered by police or interdiction officers on [Interstate] 20 that they don't draw any red flags. But what they don't take into account is when they do that and then one of those 18-wheelers gets encountered in New York with 1,200 pounds of marijuana, that throws up a red flag for all 20 of those trucks that were put together under the same umbrella.

This connection merely creates suspicion or "a red flag" for all those involved, including the other twenty or so companies that are represented by Chung's insurance agent. Other than having the same insurance agent, the State cannot show any other link or connection between Chung and the individual involved in the HSI investigation.

¶38.    The majority wants to affirm the forfeiture of Chung's property by relying on these loose connections to a DEA investigation and a HSI investigation. Essentially, the majority

wants to apply a guilt-by-association mentality. But "[w]e do 'not recognize guilt by association.'" ***Buchanan v. State***, 316 So. 3d 619, 631 (Miss. 2021) (quoting ***Hughes v. State***, 983 So. 2d 270, 276 (Miss. 2008)); *see also **Davis v. State***, 586 So. 2d 817, 821 (Miss. 1991) ("Guilt by association is neither a recognized nor tolerable concept in our criminal law." (citing ***Pryor v. State***, 239 So. 2d 911, 912 (Miss. 1970))). Even proceeding under the guilt-by-association mentality, the majority fails to recognize that these connections are too vague, distant, and indirect to create a strong enough link between Chung, the individuals under federal investigation, and drug trafficking. Without connecting Chung to these individuals, the State has no evidence that directly implicates Chung's involvement in drug trafficking.

¶39.    Another piece of evidence that the State and the majority claim links the money to drug trafficking is the fact that Chung's truck had New York and New Jersey fuel and tax stickers. Maj. Op. ¶¶ 17-18. The mere possession of these stickers does not mean that Chung was involved in illegal drug activities. The State's own expert witness testified that possession of these stickers implies that Chung had hauled goods in that area within that year. The State did not present evidence that showed how possession of these stickers was related to drug trafficking.

¶40.    While we have recognized the probative value of a dog sniff, we have recognized also the importance that the test be administered properly. ***Evans v. City of Aberdeen***, 926 So. 2d 181, 185 (Miss. 2006). The majority states that there is "[s]ome confusion . . . regarding the

26

drug dog test." Maj. Op. ¶ 18 n.2. But there is no confusion. It is clear that the trained canine, Voodoo, did not notify his handler, Officer Shack, per the dog's training. Instead of indicating as he had been taught, Voodoo showed a just noticeable difference (JND) in his behavior.

¶41.    Contrary to the majority's assertion, Officer Shack testified that his dog would notify him either by sitting or by standing and staring. Maj. Op. ¶ 18 n.2. Specifically, Officer Shack testified that Voodoo was trained to come to a complete sitting position when in the presence of drugs. The officer explained that "[Voodoo] is kind of hardheaded sometimes" and will stand and stare instead of sitting. Regarding the traffic stop in question, Officer Shack stated repeatedly that his dog had a JND reaction to the box that contained Chung's money. He explained that dogs can have a JND, which is *any* change in the dog's behavior. While Officer Shack acknowledged that Voodoo did not sit, stare, bark, or paw at the box, he did not give an explanation about what changed in the dog's behavior. Rather, he simply agreed that Voodoo spent "some time at" the box.

¶42.    The majority sees no issue with the fact that Voodoo did not alert properly since Officer Shack testified that his dog had a JND towards the box containing the money. Maj. Op. ¶ 18 n.2. But the fact that Voodoo did not indicate per his training is of great importance and should be given much emphasis for several reasons. The first reason is that there is a need for the dog to have a proper technique in order to adequately communicate the presence of narcotics and not some other substance. Having a trained response, *i.e.*, a complete sit, is

27

easily understandable and viewable. But a JND is very ambiguous. Because any change in a dog's behavior constitutes a JND, this enables the dog's handler to determine what the dog is saying, instead of the dog communicating to the handler.

¶43. Another reason emphasis should be placed on Voodoo's failure to indicate adequately is due to the fact that his inconclusive indication is the State's only evidence that directly links the seized money to any prior drug activity. The majority relies on Voodoo's training records for support. Maj. Op. ¶ 18 n.2. But the training records did not include how the dog indicated the presence of drugs. Rather, the documents evidenced Voodoo's inability to properly indicate the presence of narcotics. Voodoo struggled to find the hidden drugs during two separate training exercises. In the first exercise, Voodoo "walked by [the meth] multiple times before alerting." In the other exercise, Voodoo did not locate the drugs until after the officer "burped" the box. In addition, several of the training documents mentioned that Voodoo needed to continue to work on his final response, which was sitting. Similar to *Ruiz*, the fact that the dog did not indicate per his training is akin to the State's failing to collect, test, and preserve the residue. *See Ruiz*, 227 So. 3d at 1137. As a result, I find that, while a dog sniff may have probative value, the inconclusive drug-dog test conducted in this matter is unpersuasive.

¶44. Because the State and local law enforcement agency benefits from this forfeiture, we should closely scrutinize the State's evidence. Doing so, it is apparent that the totality of the evidence does not support forfeiture in this case. While Chung's possession of $225,000 may

28

give rise to suspicion about its origins, it does not establish a sufficiently close relationship between the seized money and drug trafficking. The closest the State could place Chung near a known drug-city destination was a city that was about an hour away. The State's only link to a federal drug investigation was that an insurance agent represented Chung, a busted drug trafficker, and several other companies. Even the State's own witnesses testified about noncriminal reasons for using paper logs. The drug canine showed some unknown change in behavior in order to indicate that the money had been around the presence of drugs. When all of the evidence is considered together, simply not enough justified forfeiture. The State did not meet its burden of proof. We should remain consistent with Mississippi law and find that the $225,000 should be returned to Chung.

**KING AND COLEMAN, P.JJ., AND ISHEE, J., JOIN THIS OPINION.**